IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| DR. MARK G. TURNER, DDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:16-cv-00043 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | By: Hon. Jackson L. Kiser |
| MEDICAL ASSISTANCE SERVICES, | ) | Senior United States District Judge |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

_____

Dr. Mark G. Turner ("Plaintiff") filed the present action on September 9, 2016. (*See* Compl., Sept. 9, 2016 [ECF No. 1]; First Am. Compl., Nov. 15, 2016 [ECF No. 26] (hereinafter "Am. Compl." or "the Complaint").) Count 1 alleges that each Defendant violated Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), and also seeks treble damages under Section 4 of the Clayton Act. (Am. Compl. ¶ 67–78); 15 U.S.C. § 15. Counts 2 through 5 allege various state claims of tortious interference with existing and prospective contracts and economic advantage against the individual defendants.[1] Defendants have filed a total of four motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[2] [ECF Nos. 27, 29, 31, 39]. In addition,

---

[1] Count 2 alleges intentional interference with existing contracts (Am. Compl. ¶¶ 79–88); Count 3 alleges intentional interference with prospective contracts (*Id.* at ¶¶ 89–98); Count 4 alleges intentional interference with prospective economic advantage (*Id.* at ¶¶ 99–106); and Count 5 alleges intentional interference with contracts terminable at will. (*Id.* at ¶¶ 107–115.) The individual defendants are Dr. David Black, Dr. Greg Harvey, and Dr. Terry Dickinson.

[2] The Virginia Department of Assistance Services ("DMAS") and DentaQuest, LLC, each filed their own motion. (DMAS Mot. to Dismiss, Dec. 5, 2016 [ECF No. 27]; DentaQuest Mot. to Dismiss, Dec. 5, 2016 [ECF No. 29].) David Black, Terry Dickinson, and the Virginia Dental Association filed a joint motion. (Black et al. Mot. to Dismiss, Dec. 7, 2016 [ECF No. 31].) Blue Ridge Dental Group, Commonwealth

DentaQuest and the Virginia Department of Medical Assistance Services ("DMAS") argue that state-action immunity shields them from any antitrust liability. For the reasons stated below, I will grant all four motions with regard to Count 1. Because the Counts 2–5 are alleged under Virginia law, I will decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c).

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff is a dentist who, at the time of the alleged events, was working in the Roanoke area "treating adult Medicaid patients exclusively for exams, x-rays, and [tooth] extractions." (Am. Compl. ¶ 3.) Plaintiff provided these services through the Smiles for Children ("SFC") program. Contrary to what its name suggests, SFC provides limited dental care to Medicaid patients over the age of 21. Plaintiff "worked exclusively with the Over 21 portion of the Medicaid Smiles For Children program" from January 2008 until early 2014. (*Id.* at ¶ 8.) While Medicaid provides funding, DMAS is in charge of overseeing the program in Virginia. (*Id.* at ¶¶ 5–6.) DMAS contracts with DentaQuest to provide day-to-day administration of SFC. ( *Id.* at ¶ 21.) DentaQuest, through its predecessor company, Doral Dental USA, entered into a contract with Plaintiff (the "DentaQuest Agreement") whereby Plaintiff agreed "to provide Medicaid approved dental services to individuals in the [SFC] program in the Over 21 division." (*Id.* at ¶ 7). From 2008 to 2014, Plaintiff "was likely the largest safety net adult Medicaid practice in Virginia," and "was treating at least 75% of the eligible Medicaid adults receiving treatment in the Roanoke Valley." (*Id.* at ¶ 10.)

At the same time that Plaintiff was providing these services, the Mission of Mercy ("MOM"), a "free volunteer traveling dental clinic," was operating in the Roanoke area. (*Id.* at ¶ 13.) Defendant Terry Dickinson was the clinic's Executive Director and founder of MOM. MOM

Dental Clinic, and Dr. Greg Harvey also filed a joint motion. (Blue Ridge et al. Mot. to Dismiss, Jan. 4, 2017 [ECF No. 39].)

2

was also supported by the Virginia Dental Association ("VDA"). (*Id.*) The VDA is "a non-profit organization of dentists committed to enhancing the professional lives of its member dentists." (*Id.* at ¶ 24.) Dr. Terry Dickinson was the executive director of the VDA at the time of these events. (*Id.* at ¶ 13.) Plaintiff was the sole "private provider accepting Over 21 Medicaid patients in his Western Virginia service area." (*Id.* at ¶ 11.) Although Plaintiff contends competition from MOM hurt his practice, he also credits his own practice as instrumental in forcing MOM to close:

> The MOM organizers publicly admitted that their model no longer made any financial sense. [Plaintiff's] 6 years of treating 6,100 patients, performing [sic] 26,250 extractions certainly reduced he backlog demand for these services. Dr. Turner's efforts were certainly a contributing factor with the Roanoke Mission of Mercy going out of business.

(*Id.* at ¶ 40.)

Plaintiff alleges that the MOM organizers used their "market power" to restructure their clinic's model "to push the Plaintiff out of his dental market niche, and out of business." (Am. Compl. ¶ 18.) The MOM clinic was reorganized into what Plaintiff refers to as "Mini-MOMs." He does not elaborate on this model beyond stating that the Mini-MOMS would provide free dental care to eligible patients, including Medicaid patients under the age of 21. Those over 21 were referred to the Commonwealth Dental Clinic ("CDC"). (*Id.* at ¶¶ 41–42.) CDC was founded by Greg Harvey to treat Medicaid patients over the age of 21 after the MOM clinic ended its operations. Because the new Mini-MOMs did not take Medicaid patients over the age of 21, it would refer those patients to CDC. (*Id.*) CDC took referrals from Mini-MOM but also from other clinics that did not accept Medicaid, such as Blue Ridge Dental Group ("BRDG"), a practice formerly owned by David Black but purchased by Harvey. (*Id.* at ¶¶ 31, 42.) The Mini-MOMs were "fully endorsed" by the VDA (*Id.* at ¶ 42.)

As stated above, Plaintiff's patients came as a result of the service agreement with DentaQuest, which was acting as the third-party administrator for the SFC program overseen by DMAS. In January 2014, DentaQuest terminated its agreement with Plaintiff without cause. According to Plaintiff, "[t]he termination order came from outside of [DentaQuest headquarters], and had been requested by representatives of DMAS at least as early as January 2013." (*Id.* at ¶ 43.) According to the agreement, either party could terminate the agreement without cause provided that the terminating party give 30 days' notice.[3] (Dental Provider Serv. Agmt. ¶ 15(c), July 16, 2007 [ECF No. 30–1].) Plaintiff states that, although it may be unclear why the agreement was terminated, "it is clear that Defendant Terry Dickinson was involved in the termination decision and that he was regularly advised on the progress of that decision by representatives of DMAS." (Am. Compl. ¶ 44.)

Plaintiff's antitrust claim can be boiled down to this: Dickinson was somehow in contact with DMAS while it was in the process of directing DentaQuest to terminate the agreement with Plaintiff.[4] At some unknown time, Plaintiff contends Dickinson told Black that Plaintiff's contract was about to be terminated. Black, along with Harvey, launched CDC in order to accept Medicaid patients over the age of 21, the patient base that had formed the entirety of Plaintiff's

---

[3] Ordinarily, on a 12(b)(6) motion, a court cannot consider outside evidence without converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). The Fourth Circuit, however, has recognized an exception for materials "integral to and explicitly relied on in the complaint." *Phillips v. LCI Int., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). While the agreement was provided to the Court as part of DentaQuest's brief in support of its Motion to Dismiss [ECF No. 30], Plaintiff refers to the agreement numerous times in his Complaint and does not contest its authenticity in his Response. (*See generally* Pl.'s Resp. to DMAS & DentaQuest Mot. to Dismiss, Dec. 30 2016 [ECF No. 35].) In contrast, the e-mails attached by Plaintiff to his opposition briefs contain substantive evidence to bolster the allegations in his Complaint. These do not fall under the *Phillips* exception, and I will not consider them. (*See Id.* Exs. A–C, [ECF No. 35–1].)

[4] Plaintiff does not seem to dispute that he was given appropriate notice, but he alleges that DentaQuest notified Plaintiff's patients of the termination before Plaintiff had a chance to appeal the decision in violation of "Directors' Policies." (Am. Compl. at ¶ 57.) It is unclear from the face of the face of the Complaint whether these are DentaQuest or DMAS policies. (*Id.*)

4

practice since at least 2008. (*Id.* at 33.) Black and Harvey purchased a building for $250,000 to house the new clinic. (*Id.*) The VDA, led by Dickinson, endorsed CDC even though it had "not supported the Over 21 Benefit in the past." (*Id.* at ¶ 25.) At an unspecified time, Plaintiff made a complaint to the VDA Ethics Committee regarding perceived ethical violations by Black. According to Plaintiff, "[t]he VDA Ethics Committee likely did not conduct a review of [Plaintiff's complaint], as, if they did, David Black would have been found blatantly guilty based on the facts." (*Id.* ¶ 27.) It is unclear whether there is a factual overlap between the ethics complaint and these allegations.

Plaintiff alleges several injuries as the result of Defendants' actions. For purposes of his Section 1 claim, Plaintiff determines that the relevant market for measuring antitrust injury is:

> (1) adult (over 21) dental services recognized under the Medicaid approved *Smiles for Children* program; (2) tooth extractions and related services, as identified under the Medicaid approved Over 21 Smiles For Children program; and (3) Medicaid approved services for the Over 21 members of the Smiles For Children program in Western Virginia, and within a two hour drive of Roanoke, Virginia.

(*Id.* at ¶ 52.) Plaintiff claims that the market for over–21 Medicaid patients "will be significantly diminished" and will prohibit other dentists from entering the market. (*Id.* at ¶ 60.) CDC now has an alleged monopoly over Plaintiff's former patient base, and CDC can use its "influence" in the dental community to ensure that it maintains a monopoly. (*Id.*) Moreover, Plaintiff notes that Defendants' actions caused the loss of the "market value of [Plaintiff's] dental practice," loss of income, damage to his reputation, and legal expenses. (*Id.* at ¶ 63.) Plaintiff also faults Defendants for the loss of his Virginia dental license though he does not specify how Defendants are responsible.

5

## II. DISCUSSION

### A. State-action Immunity

DMAS argues that it is protected by state-action immunity, which protects state actors from liability under Section 1 of the Sherman Act. Under Section 1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The doctrine of state-action immunity was first articulated in *Parker v. Brown*, 317 U.S. 341 (1943). In *Parker*, California implemented production limits among raisin farmers to keep prices from bottoming out. The "California Agricultural Prorate Act" authorized state officials to "restrict competition among [raisin farmers] and maintain prices in the distribution of their commodities . . . ." *Id.* at 346. The Court held that there was "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350. The Count ruled that the Sherman Act was never intended to apply to state actors though it included an important caveat: while actions directed by the state are outside the scope of Section 1, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Id.* at 351. In turn, this begs the question: What qualifies as "the state?"

To answer this question, the Supreme Court developed a two-part test to determine whether certain quasi-agencies qualified for state-action immunity. *See generally California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97 (1980). Previously, the Supreme court held that the Virginia State Bar's minimum fee schedule was not mandated by ethical rules established by the Virginia Supreme Court; as a result, the Bar was not immune to antitrust liability. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790 (1975) ("[W]e need not inquire

further into the state-action question because it cannot be fairly said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent.") In contrast, the Court had also held that the Arizona State Bar's rules on attorney advertising were immune from a Sherman Act challenge on the basis that the advertising limits were clearly mandated by the Arizona Supreme Court's established rules of professional responsibility. *Bates v. State Bar of Arizona*, 433 U.S. 350, 362 (1977).

To provide greater clarity to the issue, the Supreme Court held that in order to be immune from Section 1 claims, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy, [and] the policy must be actively supervised by the State itself." *Midcal*, 445 U.S. at 105 (internal quotation marks omitted). *Midcal* involved a system of wine pricing established by the state, but the actual prices were set by private actors with little oversight from public officials. *Id.* at 105–06. *Parker* immunity could not be had simply by "casting such a gauzy cloak of state involvement over what was essentially a private price-fixing arrangement." *Id.* at 106.

Most recently, the Supreme Court adjusted the *Midcal* test in *North Carolina State Bd. of Dental Examin'rs v. Fed. Trade Comm'n*, 135 S. Ct. 1101 (2015). Previously, in *Town of Hallie v. City of Eau Claire*, the Court had carved an exception into the *Midcal* test: municipalities were not subject to the second part of the test, the "active supervision" requirement. 471 U.S. 34, 46–47 (1985). The "active supervision" requirement was designed to reign in incentives for private actors to engage in self-dealing. *See id.* at 47 ("Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.") In dicta, the Court suggested that its ruling could be extended to state agencies. *See id.* at 46 n. 10 ("In cases in which the actor is a state agency, it

7

is likely that active state supervision would also not be required, although we do not here decide that issue.")

In *NC Dental*, the North Carolina State Board of Dental Examiners (the "Board") was sued after sending cease-and-desist letters to non-dentists who were providing teeth whitening services. 135 S.Ct. at 1108. After receiving these letters, many of the non-dentists stopped providing the whitening services. *Id.* North Carolina's Dental Practice Act gave the Board the authority to regulate the practice of dentistry, but it did not specify whether the practice of dentistry included teeth whitening. *Id.* at 1107–08. The Court ruled that whether an entity is exempt from the "active supervision" requirement turns not on the "formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." *Id.* at 1114. Imposing the "active supervision" requirement depends on whether an entity engaging in anticompetitive conduct is "more like [a] prototypical state agenc[y]" rather than "specialized boards dominated by active market participants." *Id.* The Supreme Court held that the Board had overstepped its authority: "[A] state board on which a controlling number of decisions makers *are active participants in the occupation the board regulates* must satisfy *Midcal's* active supervision requirement." *Id.* (emphasis added).

DMAS is overseen by the Virginia Secretary of Health and Human Resources and a Director of Medical Assistance Services (the "Director"), appointed by the Governor and confirmed by the General Assembly. Va. Code § 32.1-323. There is a board within DMAS, which "is authorized to prepare . . . and submit to the U.S. Secretary of Health and Human Services a state plan for medical assistance services pursuant to Title XIX of the United States Social Security Act . . . ." Va Code § 32.1-325(A). In implementing this state plan, the Director has the authority to "enter into all contracts necessary or incidental to the performance of [DMAS's]

duties and the execution of its powers as provided by law." Va Code § 32.1-325(D)(1). The Board consists of eleven Virginia residents, appointed by the Governor, "five of whom shall be health care providers and six of whom shall not . . . ." Va. Code § 32.1-324(A). The Director serves as the executive officer of the board but is not a member. Va. Code § 32.1-324(B).

The state-action immunity analysis presents three questions: (1) was DMAS acting with "clearly articulated" state policy in directing DentaQuest to terminate its agreement with Plaintiff; (2) if yes, does DMAS qualify for the municipality exception articulated in *Hallie*; and (3) if DMAS does not qualify for the *Hallie* exception, did it satisfy the "active supervision" requirement?

Assuming that the termination of the DentaQuest Agreement by DMAS ran afoul of the Sherman Act, DMAS would have to show that its actions were in line with "clearly articulated" state policy. This requirement is met "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *NC Dental*, 135 S. Ct. at 1112 (quoting *Fed. Trade Comm'n v. Phoebe Putney Health Sys., Inc.*, 133 S.Ct. 1003, 1013 (2013) (internal quotation marks omitted)). Plaintiff argues that an entity "may not invoke *Parker* immunity unless the actions in question are an exercise of the State's sovereign power." (Pl.'s Memo in Opp. to Mot. to Dismiss 10, Dec. 30, 2016 [ECF No. 35] (hereinafter "Pl.'s First Resp.").) While true, Plaintiff seems to suggest that only legislation and decisions of a state supreme court fall into this category. *See id.* (citing *Hoover v. Ronwin*, 466 U.S. 558, 567–68 (1984)). This, of course, is far too narrow, and contradicts the Supreme Court's statement that the anticompetitive effects can be "*implicitly endorsed.*" *See NC Dental*, 135 S.Ct. at 1112 (emphasis added). In fact, the very case that

Plaintiff cites found that a state bar's authority to formulate bar admission requirements met the "clearly articulated" requirement, thereby operating as an extension of the state supreme court's sovereign power. *See Hoover*, 466 U.S. at 572–73.

Here, DMAS's organic statute gives it the power to "enter into all contracts necessary or incidental to the performance of [DMAS's] duties and the execution of its powers as provided by law." Va Code § 32.1-325(D)(1). Of course, the logical extension of the authority to enter into contracts is the authority to terminate them. DMAS directed its third-party administrator of the Smiles for Children program to terminate Plaintiff's provider agreement. Plaintiff admits this, and he does not contest that DMAS had the authority to do so. (*See* Am. Compl. ¶ 43 ("The termination order came from outside [of DentaQuest's headquarters], and had been requested by representatives of DMAS . . . .")) Based upon the facts contained in the Complaint, and the applicable law, DMAS has satisfied the "clearly articulated" prong.

The second question is whether DMAS is exempt from the "active supervision" requirement. In *Hallie*, the Supreme Court held that municipalities were exempt from the requirement in part because there was little risk of self-dealing. 471 U.S. at 46–47. It also suggested that prototypical state agencies would likely fall under this exception. *Id.* at 46 n.10. In contrast, *NC Dental* held that the active supervision requirement would apply to the noncompetitive actions of a state board of dental examiners when that board is dominated by active market participants. *NC Dental*, 135 S. Ct. at 1113.

Plaintiff argues that *Hallie* only stands for exempting an "electorally accountable municipality with general regulatory powers and no private price-fixing agenda." (Pl.'s First Resp. at 13). This is the explicit holding of *Hallie*, but it ignores the obvious and intentional opening for prototypical state agencies. Here, Plaintiff attempts to characterize DMAS as a

"quasi-public and quasi-private" agency. This Court must accept Plaintiff's factual conclusions as true for purposes of Defendants' motions to dismiss. This Court is not required, however, to accept Plaintiff's legal conclusions, such as Plaintiff's conclusion that DMAS is a quasi-public agency. *Twombly*, 550 U.S. at 555. Plaintiff correctly points out that nomenclature, acting alone, is not a free pass to state-action immunity. The Supreme Court has held that agencies have two unique qualities: (1) they are "specifically created . . . for the furtherance of governmental objectives"; and (2) the government does not "merely hold[] some shares but controls the operation of the corporation through its appointees." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). DMAS is created by statute, operates under the direction of the Secretary of Health and Human Resources, and its Director is appointed by the Governor and confirmed by the General Assembly. It clearly meets both of the *Lebron* criteria.[5] There is nothing in DMAS's organic statute which would signify that DMAS is anything but a prototypical state agency.

Considering both the facts contained in the Complaint as well as DMAS's organic statute, it is clear that DMAS is a prototypical government agency. Following the dicta in *Phoebe Putney* and *Hallie*, DMAS is exempt from the "active supervision requirement."[6] As a result, it is not necessary to delve into the third part of the analysis to determine whether DMAS was in fact

---

[5] *Lebron* dealt with the federal agencies, but its conclusions easily be applied to state agencies.

[6] DentaQuest incorporated all of DMAS's arguments related to state-action immunity in its own brief. (DentaQuest Br. in Supp. of Mot. to Dismiss p. 11, Dec. 5, 2016 [ECF No. 30].) The analysis is not as clear cut when it comes to DentaQuest. DentaQuest is not a prototypical state agency; it is a private limited liability company, which contracted with DMAS to administer SFC. Given the ruling in *NC Dental*, it seems likely that DentaQuest would be subject to the active supervision requirement, but I do not decide that here. Assuming it is subject to the active supervision requirement, DentaQuest would then need to show proper supervision. Both questions involve factual inquiries best reserved for summary judgment and trial.

actively supervised by the state. Because DMAS has immunity against claims under the Sherman Act, Plaintiff has failed to state a claim against DMAS.[7]

## B.      Failure to State A Claim

In order to sufficiently plead a violation of the Sherman Act, Plaintiff must plausibly allege "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). Once Plaintiff alleges sufficient facts to plausibly establish these elements, he must show that he has suffered an antitrust injury as a but-for result of Defendants' anticompetitive conduct. *Id.* at 202-03. An antitrust injury is one where the injury "is of a type the anti-trust [sic] laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotation marks omitted)).

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In the antitrust context, this means that a complaint must contain enough factual matter "to suggest that an agreement was made." *Id.* at 556. Furthermore,

> an allegation of parallel conduct[8] and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does

---

[7] Even if DMAS was not immune, the grounds for dismissing the action discussed *infra* pp. 14–15 would apply with equal force to the claims against DMAS.

[8] The Fourth Circuit has stated that "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993). In *Twombly*, the Supreme Court stated that a successful Section 1 claim must plead parallel conduct *and* additional facts indicating a "meeting of the minds." *Twombly*, 550 U.S. at 557 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the

12

> not suggest conspiracy, *and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.* Hence, when allegations of parallel conduct are set out in order to make a Section 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id.* at 557 (emphasis added). Moreover, allegations must be made regarding each defendant; "[a] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

Plaintiff's Complaint spins a wide web of players in what was either a horizontal agreement or a group boycott; at oral arguments, Plaintiff's attorney did not seem to know which label was more appropriate. Moreover, in response to my question on how Plaintiff's allegations differ from the insufficient allegations in *Twombly*, Plaintiff's counsel could not provide a convincing distinction.

Plaintiff relies heavily on *NC Dental* to rebut any argument that he has failed to sufficiently plead a claim under Section 1. (*See, e.g.*, Pl.'s Resp. to Blue Ridge et al. Mot. to Dismiss 11, Jan 19, 2017 [ECF No. 52].) The facts of *NC Dental*, however, differ greatly from the instant case. Most notably, there was no dispute in *NC Dental* that the defendants had entered into an agreement to restrain trade. The defendants opened an investigation into nondentists providing teeth whitening services, and then the board agreed to issue 47 cease-and-desist letters to nondentists providing teeth whitening services. *NC Dental*, 135 S. Ct. at 1108. There was no doubt, unlike here, that an agreement had been made to require a dental license to perform teeth whitening and take action against nondentists who provided teeth whitening. In this regard, *NC Dental* has very little in common with the facts of this case. Given the number of individuals and

---

agreement necessary to make out a [Section 1] claim; without that further circumstances pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.").

organizations involved here, it is best to analyze the sufficiency of Plaintiff's allegations with regard to each defendant.

1. DMAS

Plaintiff alleges that the order to terminate the DentaQuest Agreement came from representatives of DMAS. (Am. Compl. ¶ 22.) Plaintiff admits that "it is not clear why representatives of DMAS may have sought the Plaintiff's termination . . . ." (*Id.* at ¶ 44). This contradicts Plaintiff's assertion that there was a concerted effort to put him out of business. Plaintiff also states that DMAS conspired with other defendnats to take away his dental license (*Id.* at ¶ 63.). Plaintiff provides little factual support for this allegation and did not address it at oral arguments. This allegation is confusing given that Plaintiff characterizes DMAS as being "charged with regulating the practice of Medicaid programs" rather than regulation of the practice of dentistry. (*Id.* at ¶ 22.) DMAS's organic statute does not grant it any power over the issuance or revocation of a dental license. He has failed to assert any facts alleging how any of the defendants could have caused his dental license to be suspended.

Plaintiff also alleges that DMAS has "exercised the power to exclude dentists from competing in relevant service markets . . . suspend provider contracts, issue fines, and order dentists and others to take or refrain from certain conduct." (*Id.* at ¶ 54.) Even if this accepted as true, Plaintiff provides no facts regarding *how* DMAS exercised these powers aside from ordering DentaQuest to terminate the provider agreement. At most, Plaintiff asserts that all defendants "conspired to forbid and deter Plaintiff from providing dental service under the *Smiles for Children* Medicaid program." (*Id.* at ¶ 56.) Again, he provides little factual support for this and contradicts himself by stating that it is "not clear" why DMAS ordered DentaQuest to terminate the contract. (*Id.* at ¶ 44.)

Plaintiff has failed to provide sufficient factual support to meet the *Twombly*/*Iqbal* plausibility standard and allege a Section 1 claim against DMAS. The Complaint includes the precise type of bare assertions of conspiracy that the Supreme Court determined to be insufficient to properly state a claim under Section 1. DMAS raised this argument in their brief, but Plaintiff made no effort to respond. (*See* DMAS Memo in Supp. of Mot. to Dismiss p. 9–11, Dec. 5 2016, [ECF No. 28]; DMAS Reply Br. p. 1, Jan. 6, 2017 [ECF No. 46].) Considering the insufficient allegations and failure to respond, Plaintiff's claim against DMAS will be dismissed.

### 2. DentaQuest

In its brief, DentaQuest makes two arguments: (1) any claims against DentaQuest by Plaintiff should be dismissed on the basis that the provider agreement gives DentaQuest absolute immunity against all civil claims; and (2) Plaintiff has failed to state a claim against DentaQuest.

The first argument should not be settled at this stage given that disputes over contract provisions involve several questions of fact. Under Virginia law, determining the validity of an exculpatory clause requires an examination of three factors such as (1) whether the clause contravenes public policy, (2) whether the clause could be readily understood by a reasonable person, and (3) whether the legal claim was within the contemplation of the parties when they included the exculpatory provision. *Kocinec v. Public Storage, Inc.*, 489 F. Supp. 2d 555, 559 (E.D. Va. 2007); *see also All Bus. Solutions, Inc. v. Nationsline, Inc.*, 629 F. Supp. 2d 553, 559–60 (W.D. Va. 2009) (noting that the leading treatises on contracts "reveal[] that courts generally refuse to enforce provisions that purport to limit a party's liability for future intentional misconduct"). Such questions are reserved for the fact finder and should not be decided at this stage of the proceedings.

15

Next, DentaQuest argues that Plaintiff has failed to allege a claim against it. According to Plaintiff, DentaQuest contracted with DMAS to "handle most of the administration and supervision of the Medicaid Smiles for Children program in Virginia, and DentaQuest would coordinate its actions with DMAS." *(*Am. Compl. ¶ 6.) DentaQuest "did not act independently, and took its orders . . . from Defendant DMAS." (*Id.* at ¶ 21.) DentaQuest "wanted to terminate Plaintiff's private practice and replace that practice with . . . Commonwealth Dental Clinic." (*Id.*) Plaintiff also alleges that DentaQuest "sent notices" to Plaintiff's patients, advising them that he was no longer a provider under the Smiles for Children program; Plaintiff alleges this was done before he had time to appeal the termination decision.

Plaintiff has failed to state a Sherman Act claim against DentaQuest. Plaintiff freely admits that DentaQuest took its orders from DMAS, and he does not allege that an agreement took place among DentaQuest and any other defendant to engage in anticompetitive conduct, let alone one that would satisfy the *Twombly*/*Iqbal* plausibility standard. The plain language of the provider agreement states that either party could terminate with thirty-days' notice. (Serv. Agmt. ¶ 15(c)(1), July 16, 2007 [ECF No. 30–1].) It is possible that DentaQuest breached the agreement by preemptively notifying Plaintiff's patients of the termination, but that is not the Court's responsibility to decide. Either way, it would not form the basis for an antitrust violation.

### 3. Dr. Terry Dickinson & The Virginia Dental Association ("VDA")

Dickinson is the Director of the VDA and was heavily involved in the MOM clinic. As VDA Director, Dickinson was involved in influencing "dental policies and practices" in Virginia. (Am. Compl. ¶ 23.) The Complaint alleges that "it is clear" that Dickinson was involved in the decision to terminate the DentaQuest Agreement, and "that he was regularly advised on the progress of that decision by DMAS representatives." (*Id.* at ¶ 44.) Plaintiff provides no factual

support for these allegations; assuming that Dickinson was advised on the decision to terminate the agreement, that does not amount to an agreement to engage in anticompetitive conduct. Accepting Plaintiff's allegations as true, it seems that Dickinson was, at most, updated on the DMAS's decision-making process; there is no allegation that he made an unlawful agreement with DMAS or anyone else to terminate the DentaQuest Agreement.

Dickinson is being sued both in his individual capacity and in his official capacity as Director of the VDA. The VDA is also listed in this suit. VDA is alleged to have supported Plaintiff's competitors, MOM and Commonwealth Dental Clinic, without having "supported the Over 21 benefit in the past, and does not mention it as a resource on their web site [sic]." (Am. Compl. ¶¶ 24–25.) The allegations seem to apply to Dickinson both as an individual and as director of the VDA; there are no other allegations regarding an unlawful agreement between other defendants and anyone else at the VDA. Therefore, Plaintiff has failed to state a Section 1 claim against VDA. The Section 1 claim against both Dickinson and VDA will be dismissed.

### 4. Dr. David Black

Along with Dickinson, Black is a co-founder of the MOM clinic, and the director of the Mini-MOM project. (*Id.* at ¶¶ 28–29.) According to Plaintiff, he is a "confidant" of Dickinson. (*Id.* at ¶ 29.) Plaintiff alleges no contact between Black and DMAS or DentaQuest. Instead he states that "*on information and belief*, Defendant Dickinson communicated with Defendant David Black on the Progress of Defendant DentaQuest's terminating Plaintiff Dr. Turner from The Smiles For Children Over 21 Medicaid program." (*Id.* at ¶ 45 (emphasis added).) If Plaintiff has "information" supporting this allegation, he must provide enough to nudge his Complaint over the plausibility threshold; asserting mere "belief" is exactly what the Supreme Court rejected in *Twombly* and *Iqbal*. A complaint is not a leap of faith. A plaintiff cannot base a

17

complaint on a mix of speculation and conclusory statements in the hope that he will be vindicated in discovery. Assuming that the communication took place, there are no facts suggesting that it included an unlawful agreement, and "[n]ot every instance of cooperation between two people is a potential 'contract, combination . . . or conspiracy in restraint of trade.'" *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 280 (4th Cir. 2012) (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)). The Complaint does not provide factual evidence to support the allegation that this communication was unlawful. At best, Plaintiff is alleging parallel conduct, which, on its own, is insufficient.

### 5. Dr. Greg Harvey, Blue Ridge Dental Group, and Commonwealth Dental Clinic

Harvey is the owner of Blue Ridge Dental Group ("BRDG"), and a founder of Commonwealth Dental Clinic. BRDG did not accept Medicaid patients, so it would refer those patients to CDC. The Complaint is simply devoid of any facts that connect Harvey, CDC, or BRDG to the termination of the DentaQuest Agreement or to any unlawful agreement. In his response brief, Plaintiff points out that "[u]nderstandings between conspirators may be tacit and can arise without verbal communication." (Pl.'s Resp. to Blue Ridge et al. at 10 [ECF No. 52] (internal quotation marks omitted).) The law does not require a showing of an express, written agreement. It requires that Plaintiff plead facts indicating *some kind* of an agreement. While some agreements can be established through course of conduct, one would be hard-pressed to find two defendants who haphazardly fell into an agreement to restrain trade.

Here, the Complaint alleges that Harvey, a few months prior to the termination of Plaintiff's contract with DentaQuest, purchased a building, the future home of CDC, for $250,000. (Am. Compl. ¶ 33.) Black was also involved in the formation of CDC. (*Id.*) The Complaint alleges that Harvey purchased this property knowing that Plaintiff would be

terminated. (*Id.*) There is no allegation that Harvey or any other representatives of CDC or BRDG ever communicated with other defendants regarding the termination of Plaintiff's contract. At best, as alleged, the purchase of the property amounts to parallel conduct. There is nothing inherently unlawful about someone purchasing a building in order to start a dental practice even if they believe that a competitor is about to exit the market. The fact that Harvey purchased a building carries no indication that he made an agreement with DMAS, Dickinson, or any other defendant. As *Twombly* states, "allegation of parallel conduct and a bare assertion of conspiracy will not suffice." 550 U.S. at 557. Plaintiff's Section 1 claims against Harvey, CDC, and BRDG will all be dismissed for failure to state a claim.

Plaintiff has failed to allege a violation of the Sherman Act because his Complaint rests upon speculation and conclusory statements. At multiple points, Plaintiff's counsel assured the Court that it would be able to provide additional facts once discovery had begun, but this misses the entire point of *Twombly* and *Iqbal*. Fed. R. Civ. P. 8(a) does not give a would-be plaintiff free reign to engage on fishing expeditions on the basis of conclusory allegations. The Supreme Court has made this abundantly clear. Because Plaintiff has failed to plead sufficient facts to allege an agreement, the first element of any Section 1 claim, all four motions to dismiss Count 1 will be granted.

### C.    Antitrust Injury

Even if I assumed that Plaintiff had pled sufficient facts in his Complaint to show an unlawful agreement *and* could then show that the result of this conspiracy among Defendants imposed an unreasonable restraint on trade, he would still need to show that he suffered an antitrust injury to prevail under both the Section 1 of the Sherman Act and recover treble damages under Section 4 of the Clayton Act. The Clayton Act provides a cause of action for

treble damages for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. The antitrust laws were not intended to protect individuals from increased competition in the market or injuries that were not the but-for result of an antitrust violation. Plaintiff can only recover "if the loss stems from a competition-*reducing* aspect or effect of defendant's behavior." *Atl. Richfield*, 495 U.S. at 344 (emphasis in original).

Changing contractors "cannot constitute a violation of the antitrust laws. . . . This is true despite the fact that substituting one exclusive contract for another may have the consequence of 'boycotting or shutting' out the displaced contractor." *Drs. Steuer and Latham, P.A. v. Nat. Med. Enters., Inc.*, 672 F. Supp. 1489, 1502 (D.S.C. 1987) (quoting *Barry v. Blue Cross of California*, 805 F.2d 866, 871 (9th Cir. 1986)). The quoted case from the Ninth Circuit is especially instructive:

> The two doctors argue that the Plan has the consequence of boycotting or shutting out nonparticipating physicians by interfering with their access to patients insured by the Plan. We agree. However, every contract between a buyer and seller has precisely the effect of which the two doctors complain. When a buyer contracts with one seller, a second seller no longer has access to the buyer's business to the extent it is covered by the existing contract. This consequence, however, is not unlawful. The two doctors have confused an agreement to boycott with an agreement to buy and sell services.

*Barry v. Blue Cross of California*, 805 F.2d 866, 871 (9th Cir. 1986) (internal citations omitted).

Finally, the Supreme Court held that a plaintiff cannot have an antitrust injury if the injury would have resulted regardless of whether the defendants' conduct violated the Sherman Act. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977). In *Brunswick*, the plaintiff, a small bowling center, filed an antitrust claim against a large bowling manufacturer which had bought out the plaintiff's smaller, failing competitors. *Id.* at 479. As a result, the

20

plaintiff's customer base was diminished. *Id.* at 479–80. The Court found that the same injury would have resulted if, rather than being bought out by a large company, the failing competitors had obtained financing or been purchased by multiple, smaller companies. *Id.* at 487–88.

In the present case, Plaintiff's alleged injuries stem from the fact that his agreement with DentaQuest was terminated, and CDC took his place. Accepting that as true, it does not amount to an antitrust injury. It is apparent from the face of the contract that either party could terminate it at any time. As in *Barry*, Plaintiff seems to have confounded an agreement to boycott with a standard provider contract that was terminated.

*Brunswick* makes clear that Plaintiff cannot allege an antitrust injury because his alleged loss does not flow from an antitrust violation. Plaintiff alleges that DentaQuest failed to follow proper procedures when it notified Plaintiff's patients that his contract was being terminated before Plaintiff had a chance to appeal. This is irrelevant, however, because Plaintiff would be in the exact same position had DentaQuest followed the proper procedures in terminating the contract. The DentaQuest Agreement clearly states, and Plaintiff does not contest, that either party could terminate with 30 days' notice. Finally, the sole case that Plaintiff cites in order to establish his own antitrust injury and standing is *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284 (1985). This case does little to support Plaintiff's argument. *Northwest Wholesale*'s main holding is that the "act of expulsion from a wholesale cooperative *does not necessarily imply anticompetitive animus* and thereby raise a probability of anticompetitive effect." *Id.* at 296 (emphasis added). A plaintiff must also show that the defendant "possesses market power or exclusive access to an element essential to effect competition . . . ." *Id.* This case simply does not support Plaintiff's contention. The fact is that

21

*even if* Plaintiff could properly allege an unlawful agreement to restrain trade, he has not suffered an antitrust injury. As a result, Plaintiff lacks standing.

### D.     State Claims

The Sherman Act claims only account for Count 1 of Plaintiff's Complaint. Counts 2–5 all allege different variations of intentional interference with contracts and business expectations. Counts 2–5 are only alleged against the individual defendants: Black, Dickinson, and Harvey. According to the Complaint, Black is a Virginia resident. (Am. Compl. ¶ 28.) The Complaint is silent on whether Dickinson and Harvey are Virginia residents. Assuming that all three individual Defendants are citizens of Virginia, this case lacks both federal question jurisdiction and diversity jurisdiction. The Court has the authority to maintain supplemental jurisdiction over the remaining state claims, but it may decline to do so. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction [if] . . . the district court has dismissed all claims over which it has original jurisdiction.") Given that this litigation is still in its early stages, Counts 2–5 will be dismissed without prejudice to give Plaintiff a chance to refile them in state court.

## III.    CONCLUSION

Based on the above, Count 1 will be **DISMISSED** without prejudice because Plaintiff's Complaint has failed to state a claim upon which relief can be granted. Count 1 served as the sole basis for this Court's subject matter jurisdiction. Accordingly, I will decline to exercise supplemental jurisdiction as permitted under 28 U.S.C. § 1367(c). Counts 2–5 will be **DISMISSED** without prejudice.

Entered this 14th day of February, 2017.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE
